PER CURIAM.
We have on appeal the judgment of the trial court convicting Clemente Aguirre-Jarquin (Aguirre) of two counts of first-degree murder and sentencing him to death on both counts.[1] For the following reasons, we affirm the convictions and sentences.
*598 I. FACTUAL AND PROCEDURAL BACKGROUND
Aguirre was born in Honduras in 1980 and came to the United States in March of 2003. After arriving in Florida, Aguirre moved to 117 Vagabond Way, Seminole County. He lived there with two roommates until he was arrested for the murders at issue here.
At the time of the murders, Aguirre worked at a restaurant as a dishwasher and a prep cook. One of his duties was washing the knives. At one point, all three of the men who lived at 117 Vagabond Way worked at the same restaurant.
The victims, Cheryl Williams and Carol Bareis, lived next door to Aguirre. Carol was Cheryl’s mother. Cheryl’s daughter, Samantha Williams, lived with her mother and grandmother. Carol was a stroke victim, partially paralyzed, and spent most of her time in a wheelchair.
Aguirre was an acquaintance of his neighbors and occasionally visited with them socially. Samantha testified that several months before the murders she awoke at 2 a.m., and Aguirre was standing over her bed. She screamed at him and forcefully told him to leave. Samantha escorted Aguirre out the front door and locked the door behind him. The next day she reiterated that he was not to enter their residence at night without permission.
On the night of June 16, 2004, Mark Van Sandt, who was in a relationship with Samantha, went to 121 Vagabond Way to visit Samantha. He arrived at the residence around 7:30 p.m. and stayed until approximately 11:30 p.m. Samantha decided to leave with Mark and stay at his parents’ house that night. When Samantha and Mark left the residence at 121 Vagabond Way, both Cheryl and Carol were inside and alive.
Samantha was scheduled to work the next day, so Mark agreed to go back to her house and pick up her work clothes. Mark left his house around 8:45 a.m. on June 17, 2004, and drove to 121 Vagabond Way. When Mark arrived at 121 Vagabond Way, he went to the front door, which was almost always left unlocked, and attempted to open the door. However, he was unable to fully open the door because Cheryl Williams’ body was blocking the entryway. Mark squeezed his way through the door and called 911.
Deputy Pensa of the Seminole County Sheriffs Department was the first law enforcement officer to arrive. Deputy Pensa forcibly entered through the back door. Subsequently, two other officers,- Bates and Miller, arrived at the scene. Pensa and Bates noticed blood on the floor. The officers located Cheryl’s body, which blocked the front door. Thereafter, deputy Pensa found Carol lying dead on the floor in the living room. She was lying face down in a pool of blood next to her wheelchair.
One of the crime scene analysts found a ten-inch chefs knife while searching the property. The knife was found between Aguirre’s residence and the victims’ residence. The knife was the same make and model used at Aguirre’s place of employment. After speaking with the head chef at the restaurant where Aguirre worked, law enforcement officers determined that a ten-inch chefs knife was missing from the restaurant.[2]
At approximately 11 a.m. on June 17, deputies knocked on the door of 117 Vaga *599 bond Way and asked Aguirre and his two roommates if they knew anything about what happened next door. Aguirre told the officers he did not know there was a problem next door. Later that same day, Aguirre approached law enforcement officers and told them that he had information about what occurred next door. He told the officers that he went into the home and saw that Cheryl was dead. However, at this point, Aguirre told them that he only knew of Cheryl’s death. After Aguirre’s conversations with police, he was arrested for tampering with evidence from a crime scene. Subsequently, Aguirre was indicted for murder.
During the course of the trial, various law enforcement personnel, physicians, and experts testified to the evidence at the crime scene and the victims’ wounds. Cheryl had been stabbed 129 times. She had severe wounds to her lungs and leg, one of which severed her femoral artery. She also had numerous defensive wounds on her hands and feet that indicated an extremely violent struggle for her life. She was stabbed in the arms, legs, back, hands, feet, and chest. One stab wound to her left lung was considered fatal. There was an extensive amount of evidence in the area of the house where Cheryl was found, including a great deal of blood on the floor, walls, and door in the area of Cheryl’s body.
Carol suffered two stab wounds. The fatal stab wound went directly into her chest and severed her left ventricle, and the other stab wound was to her back.[3] The medical examiner testified that the stab wound to the heart would have led to an instantaneous drop in her blood pressure, which would have caused her to lose consciousness in no more than twenty seconds. It was the medical examiner’s opinion that the fatal wound to Carol was delivered while she was in the wheelchair, which caused her to fall out and led to her facial abrasions.
All of the stab wounds sustained by Cheryl and Carol were consistent with being caused by the chefs knife found between the victims’ residence and Aguirre’s residence. The knife contained Cheryl’s blood on the handle and Carol’s blood on the blade, indicating that Cheryl was killed first.
A crime scene analyst testified that there were 67 bloody shoe impressions found inside the victims’ residence. Of the 64 impressions that were comparable, all 64 were consistent with the footwear of Aguirre. The soles of his shoes contained Cheryl’s blood. Law enforcement officers obtained a search warrant for the property at 117 Vagabond Street and retrieved the bag of clothes. Aguirre’s underwear, socks, T-shirt, and shorts contained Cheryl’s blood. Further, Aguirre’s T-shirt, shorts, and underwear contained Carol’s blood and DNA.
A Florida Department of Law Enforcement (FDLE) bloodstain pattern analyst also examined Aguirre’s clothing. Aguirre’s shorts had contact stains on both the front and back. The back of his shorts also had bloodstains that were not contact stains but arrived on his shorts through some type of motion, either impact spatter or cast off. His socks had contact stains as well as spots that were “consistent with dropped blood.”
According to Aguirre’s testimony during the guilt phase, he had the day before the murders off from work so he began drinking early. He and his friends continued to *600 drink throughout the day and night.[4] Aguirre returned back to 117 Vagabond Way at approximately 5 a.m. on the morning of the murders.
Aguirre stated that he watched television and then got up to look for beer. There was no beer in his trailer so he walked next door. He attempted to go inside, but Cheryl’s body was blocking the door. However, he managed to make it inside, and he lifted Cheryl’s body on to his lap and tried to revive her. He realized she was dead so he put her back on the floor where he found her. Aguirre then walked toward the living room where Carol spent the majority of her time and found her dead as well. While in the house, Aguirre noticed the murder weapon sitting on a box near where Cheryl was lying. He stated that he feared the killer was still inside the house; therefore, he picked up the knife and screamed, “Is anybody here?” There was no reply. He then walked to Samantha’s room. She was not there, but her room had been ransacked.
Thereafter, Aguirre ran outside towards his residence and tossed the knife into the grass. He then stripped off all his clothes, placed them in a plastic bag, set the bag on top of his shed, and bathed. Aguirre initially planned to burn the clothes. He explained that he did not call police and report the murders because he was an illegal immigrant and afraid of deportation.
The jury convicted Aguirre on two counts of first-degree murder and one count of burglary with an assault or battery. Following the penalty phase, the jury recommended the death sentence for the murder of Cheryl Williams by a vote of seven to five. The jury recommended the death sentence for the murder of Carol Bareis by a vote of nine to three. After the Spencer[5] hearing, Judge O.H. Eaton, Jr. sentenced Aguirre to two death sentences, finding the aggravators outweighed the mitigators.[6]
II. ISSUES RAISED ON APPEAL
 Aguirre alleges that (A) the trial court erred in conducting the Faretta[7] colloquy and requiring Aguirre to proceed *601 with counsel; (B) the trial court erred in denying Aguirre’s motion for a new trial based on newly discovered evidence; (C) the trial court abused its discretion in denying Aguirre’s for-cause challenge of a juror; (D) the trial court erred in denying Aguirre’s motion for judgment of acquittal on the burglary charge; (E) the trial court erred in allowing Samantha Williams’ testimony regarding Aguirre’s prior uninvited entry into the victims’ home; (F) the trial court erred in instructing the jury on the cold, calculated and premeditated aggravator; (G) the trial court erred in finding that the murder of Carol Bareis was committed to eliminate her as a witness; (H) the trial court erred in finding that the murder of Carol Bareis was heinous, atrocious, or cruel.[8] None of these claims warrant relief.

A. Whether the Trial Court Erred in Conducting the Faretta Colloquy

Aguirre asserts that the trial court misstated the law when it conducted the Far-etta inquiry and denied his right to self-representation. Prior to the guilt phase, Aguirre expressed his displeasure with his appointed counsel. His unhappiness with counsel led directly to three Nelson[9] hearings. All three Nelson hearings were triggered by Aguirre’s discontent in the length of time to receive discovery, the length of time to go to trial, and his counsel’s grim outlook on the chances of an acquittal at trial.[10] Aguirre elected to continue with counsel at the conclusion of each hearing.
At the third Nelson hearing, Judge Eaton asked Aguirre to specifically explain why he wanted to fire his lawyer. Aguirre reiterated the delay in trial as well as counsel’s grim outlook on his success. The trial judge then asked counsel for further explanation and found that counsel was adequately representing Aguirre.
Subsequent to the trial judge’s finding of adequate representation, Aguirre stated that he wanted to represent himself and that he could not be represented by someone who was sure they would lose. After Aguirre’s statement, Judge Eaton conducted a colloquy to determine whether Aguirre was making a knowing waiver of counsel. The specific exchange of the colloquy that Aguirre alleges is improper is as follows:
The Court: You understand that you will not be able to have direct access to the prosecuting attorney in this case for the purpose of discussing what evidence might be presented or to negotiate a resolution in this case. It takes a lawyer to do that.
*602 After Judge Eaton completed the colloquy, Aguirre again elected to remain with his counsel and chose not to represent himself.
It is well settled that the accused has the right to self-representation. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, it is also settled that the defendant must unequivocally elect to represent himself. State v. Craft, 685 So.2d 1292, 1295 (Fla. 1996). Further, after the defendant elects to represent himself, the court must conduct a colloquy to ensure the accused is making a knowing waiver. Hardwick v. State, 521 So.2d 1071, 1074 (Fla.1988). This Court approved a standard colloquy for a trial court to employ in Amendment to Fla. Rules of Grim. Pro. 3.111(d)(2)-(3), 719 So.2d 873 (1998). The standard Faret-ta inquiry requires the judge to explicitly state the pitfalls of self-representation. The colloquy also requires the judge to state that the defendant’s access to legal resources will be limited while in custody and that the defendant is not required to possess special skills in order to represent himself. Amendment, 719 So.2d at 877.
However, a trial judge is not required to follow the colloquy word for word. See Smith v. State, 956 So.2d 1288, 1290 (Fla. 4th DCA 2007). Rather, the essence of the colloquy is to ensure the defendant makes a knowing and voluntary waiver of counsel. See Porter v. State, 788 So.2d 917, 927 (Fla.2001). In order to ensure the waiver is knowing and voluntary, the trial court must inquire as to the defendant’s age, experience, and understanding of the rules of criminal procedure. Id. When reviewing a trial court’s handling of a request for self-representation, the standard of review is abuse of discretion. Holland v. State, 773 So.2d 1065, 1069 (2000).
From the record, it is clear that Judge Eaton conducted a proper colloquy. He stated the advantages in training a lawyer possesses and then moved to the dangers and disadvantages arising from the waiver of counsel. Judge Eaton then proceeded to the line of the colloquy concerning access to the prosecutor. The standard instructions state, “Do you understand that your access to the State Attorney who is prosecuting you will be severely reduced as compared to a lawyer who could easily contact the State Attorney?” Amendment, 719 So.2d at 877. In comparison, Judge Eaton stated, “You understand that you will not be able to have direct access to the prosecuting attorney for the purpose of discussing what evidence might be presented or to negotiate a resolution in this case. It takes a lawyer to do that.” While the trial court did not follow the standard colloquy word for word, he correctly conveyed the essence of the standard instructions that, while incarcerated, a defendant’s access to the prosecutor is severely limited as compared to a lawyer who may contact the prosecutor freely.
Looking at the totality of the colloquy, we conclude that Judge Eaton did not abuse his discretion in advising Aguirre of the limitations of self-representation.

B. Newly Discovered Evidence

Next, Aguirre claims that the trial court improperly denied his motion for a new trial based on newly discovered evidence.[11] Aguirre’s claim is without merit.
*603 During the guilt phase, the State called a latent print examiner to testify about prints taken from the murder weapon. The expert testified that a palm print taken off of the murder weapon matched Aguirre’s left palm print. And, as indicated above, Aguirre also testified that he handled the knife inside the victims’ home and threw it into the grass between the victims’ house and his house.
Subsequent to the case arriving at this Court on direct appeal, FDLE notified the Seminole County Sheriffs Office of inconsistencies in the print work in this case. Specifically, FDLE found that the print examiner’s conclusion was incorrect, and the palm print attributed to Aguirre was inconclusive.
The prosecutor alerted Aguirre immediately, and Aguirre filed a motion for a new trial based on newly discovered evidence. This Court relinquished jurisdiction back to the circuit court in order to consider the claim. At the evidentiary hearing, two experts testified about the left palm print, and both experts found the palm print on the murder weapon to be inconclusive.
After the hearing, Judge Eaton denied the motion, concluding that the evidence presented during the trial was overwhelming, and that “the newly discovered evidence would probably not produce an acquittal on retrial.” Furthermore, the evidence would be cumulative due to Aguirre testifying to handling the knife. Finally, Judge Eaton found that the newly discovered evidence would not produce a different recommendation in the penalty phase.
In Jones v. State, 709 So.2d 512 (1998), this Court established a two-prong standard to use when a newly discovered evidence claim is raised. The first prong is whether the evidence is in fact newly discovered. The second prong is the materiality prong, and, in order to be successful in obtaining a new trial, the evidence must “be of such nature that it would probably produce an acquittal on retrial.” Jones, 709 So.2d at 521; see also Woods v. State, 733 So.2d 980, 989 (Fla.1999) (stating that a new trial is not required unless the newly discovered evidence would probably produce an acquittal on retrial). The newly discovered evidence is to be weighed along with the evidence presented at trial. Jones, 709 So.2d at 521. The trial court is also charged with determining if the evidence would be cumulative in nature with respect to the evidence presented at the trial. Id. The appropriate standard of review when reviewing a trial court order on a motion for new trial based on newly discovered evidence is abuse of discretion. Woods, 733 So.2d at 988 (Fla.1999).
Here, the trial court detailed the vast amount of evidence linking Aguirre to the murders, properly applied the Jones standard, and found the newly discovered evidence would probably not produce an acquittal. There was extensive evidence produced at the trial which linked Aguirre to the murders, including his bloody footprints at the crime scene and blood on his clothes. Moreover, even though the newly discovered evidence showed that Aguirre’s print was not identifiable on the murder weapon, his print on the weapon was cumulative due to Aguirre’s admission of handling the weapon. Given the above, the trial court did not abuse its discretion in denying the motion for new trial based on newly discovered evidence.

C. For-Cause Juror Challenge

Aguirre also claims that his for-cause challenge of juror Morse was wrongfully *604 denied, which forced him to exhaust his peremptory challenges and seat an objectionable juror. However, the record is clear that Aguirre did not preserve this issue pursuant to the requirements set forth in Trotter v. State, 576 So.2d 691 (Fla.1990).
Specifically, in Trotter, this Court stated:
Where a defendant seeks reversal based on a claim that he was wrongfully forced to exhaust his peremptory challenges, he initially must identify a specific juror whom he otherwise would have struck peremptorily. This juror must be an individual who actually sat on the jury and whom the defendant either challenged for cause or attempted to challenge peremptorily or otherwise objected to after his peremptory challenges had been exhausted. The defendant cannot stand by silently while an objectionable juror is seated and then, if the verdict is adverse, obtain a new trial.
Trotter, 576 So.2d at 693 (footnotes omitted). Furthermore, “the failure of a party to get a timely ruling by a trial court constitutes a waiver of the matter for appellate purposes.” Rose v. State, 787 So.2d 786, 797 (Fla.2001).
Aguirre did not comply with the Trotter requirements. Trotter requires the defendant to identify a specific juror he would have peremptorily struck, who sat on the jury, and whom the defendant challenged either for cause or peremptorily or whom he objected to. Aguirre failed to identify the juror whom he would have struck.[12] Moreover, after initially requesting additional peremptory challenges, counsel abandoned the issue without giving the court an opportunity to rule on it by announcing, “Judge, it appears we have no additional challenges.” The failure to secure a ruling on a request constitutes waiver on appeal. Rose, 787 So.2d at 797. Accordingly, the Trotter preservation requirements were not met, and this issue was not preserved.
However, even if the issue was preserved, the challenge would not prevail on the merits. As this Court explained in Busby v. State, 894 So.2d 88, 95 (Fla.2004):
“It is within a trial court’s province to determine whether a challenge for cause is proper, and the trial court’s determination of juror competency will not be overturned absent manifest error.” Fernandez v. State, 730 So.2d 277, 281 (Fla.1999). The decision to deny a challenge for cause will be upheld on appeal if there is support in the record for the decision. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997); see also Mendoza v. State, 700 So.2d 670, 675 (Fla.1997) (“A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate prospective jurors’ answers than does this Court in our review of the cold record.”); Smith v. State, 699 So.2d 629, 635-36 (Fla.1997) (“In reviewing a claim of error such as this, we have recognized that the trial court has a unique vantage point in the determination of juror bias. The trial court is able to see the jurors’ voir dire responses and make observations which simply cannot be discerned from an appellate record.”).
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by *605 the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995); see also Hill v. State, 477 So.2d 553, 556 (Fla.1985) (providing that if “any reasonable doubt exists as to whether a juror possesses the state of mind necessary to render an impartial recommendation as to punishment, the juror must be excused for cause”).
In this case, juror Morse was asked her view on the death penalty. She answered that she believed the death penalty is appropriate for all first-degree murder convictions. When questioned further by defense counsel about the possibility of returning a sentence of life rather than death, Morse stated that if she was on the jury she would “have to consider all the possibilities.” Shortly thereafter, defense counsel challenged Morse for cause and Judge Eaton denied the challenge, stating, “She didn’t say she wasn’t going to consider both possible penalties. So, I’m gonna deny your motion for cause.” The defense then struck Morse peremptorily.
Here, juror Morse initially expressed strong feelings in support of the death penalty, but then stated she would consider all the options, which supports the trial court’s denial of the for-cause challenge. Preliminary support for the death penalty is not enough to justify a successful cause challenge when a juror has subsequently indicated an ability to follow the court’s instruction. See Conde v. State, 860 So.2d 930, 939 (Fla.2003) (upholding the denial of a cause challenge of a juror who initially stated the death penalty should be mandatory in some instances, but later stated he could follow the court’s instruction to weigh the aggravators and mitigators); Barnhill v. State, 834 So.2d 836, 845 (Fla.2002) (“[Jjurors who have expressed strong feelings about the death penalty nevertheless may serve if they indicate an ability to abide by the trial court’s instructions.”) (quoting Johnson v. State, 660 So.2d 637, 644 (Fla.1995)). Therefore, the trial court did not commit manifest error in denying the for-cause challenge with respect to juror Morse.
In summary, Aguirre failed to satisfy the Trotter standard and waived the issue for appeal; thus, it is procedurally barred. However, even if it was not procedurally barred, no manifest error occurred.

D. Denial of Judgment of Acquittal

Aguirre next alleges that the trial court erred in denying the motion for judgment of acquittal on the burglary charge. We conclude that the trial court did not abuse its discretion in denying a judgment of acquittal on the burglary charge.
Section 810.015(3), Florida Statutes (2004), provides, “It is further the intent of the Legislature that consent remain an affirmative defense to burglary and that the lack of consent may be proven by circumstantial evidence.” However, in a circumstantial evidence case, a judgment of acquittal is appropriate when the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Atwater v. State, 626 So.2d 1325, 1328 (Fla.1993). The trial judge must first determine whether there is competent evidence from which the jury could infer guilt, which is a question of law. State v. Law, 559 So.2d 187,189 (Fla.1989). The decision of whether “the evidence is inconsistent with any other reasonable inference is a question of fact for the jury.” Long v. State, 689 So.2d 1055, 1058 (Fla.1997). Moreover, the circumstantial evidence standard does not require the jury to believe the defendant’s version of the facts if the State produces conflicting testi *606 mony. Peterka v. State, 640 So.2d 59, 68 (Fla.1994). In fact, “the State, as appellee, is entitled to a view of any conflicting evidence in the light most favorable to the jury's verdict.” Id.
This Court has held in circumstantial evidence cases that “where substantial, competent evidence supports the jury’s verdict, that verdict will not be reversed on appeal.” Peterka, 640 So.2d at 68.
In this case, there is substantial, competent evidence to support the jury’s verdict on the burglary charge. Specifically, Samantha Williams testified that she warned Aguirre not to come into them home without an invitation. Similarly, Aguirre testified that he was told on multiple occasions not to enter the home without an invitation. Moreover, in his testimony he did not claim that he had an invitation to enter the victims’ home on the morning of the murders. The crime scene indicates that a violent struggle took place leaving blood on the floor, walls, and door. Bloody footprints found throughout the house match Aguirre’s shoes, and his shoes contained the victim’s blood. The murder weapon was a ten-inch chefs knife of the same make and model that was missing from Aguirre’s place of employment and residence. Finally, Cheryl Williams had 129 stab wounds, many of which were defensive, and Carol B aréis had a wound in her chest so deep that it severed her heart. This circumstantial evidence, including Samantha Williams’ testimony, clearly supports Aguirre’s burglary conviction. See § 810.015(3), Fla. Stat. (2004) (“[L]ack of consent may be proven by circumstantial evidence.”).[13]
Aguirre’s assertion that the State did not prove lack of consent or prodpce evidence that was inconsistent with his hypothesis of innocence is unpersuasive. Aguirre testified that he went to the victims’ home looking for a beer and found Williams dead, walked around the home, picked up the murder weapon out of fear, ran back home, threw the knife in the grass, and lied to law enforcement officers on several occasions because he was afraid of deportation. He did not testify that he was invited to the house that morning or that he had consent to enter. His version of events does not have to be believed in light of the conflicting evidence produced by the State, which clearly shows that a violent struggle took place, that Aguirre was in the home and touched the murder weapon, and that his clothing contained the victims’ bloodstains, which arrived through motion, not contact. The evidence is simply inconsistent with every reasonable hypothesis except that of guilt.
Accordingly, we affirm the trial court’s denial of the judgment of acquittal.

E. Testimony of Aguirre’s Prior Uninvited Entry Into the Victims’ Home

Aguirre also alleges that the trial court erred in allowing Samantha Williams to testify about an encounter she had with Aguirre in her home prior to the murders because the testimony was irrelevant and highly prejudicial. We disagree. We conclude that the testimony was relevant and did not violate section 90.403, Florida Statutes (2008).
Relevant evidence is defined in section 90.401, Florida Statutes (2008), as “evidence tending to prove or disprove a material fact.” Further, “ [a]ll relevant evidence is admissible, except as provided by law.” § 90.402, Fla. Stat. (2008). Samantha’s testimony was relevant to prove that *607 Aguirre did not have consent to walk into the victims’ home whenever he pleased. Further, her testimony rebutted Aguirre’s defense that he walked into the victims’ home that fateful morning looking for a beer and did not need to knock because the door was partially open.
We further find that the testimony’s probative value was not substantially outweighed by its prejudicial effect. See Steversou v. Florida, 695 So.2d 687, 688-89 (Fla.1997) (holding that most evidence admitted will prejudice the party it is offered against, but section 90.403 is “directed at evidence which inflames the jury or appeals improperly to the jury’s emotions” (quoting Charles W. Erhardt, Florida Evidence § 403.1, at 100-01 (2d ed.1984))).
Accordingly, the trial court did not abuse its discretion admitting Samantha Williams’ testimony regarding her encounter with Aguirre several months prior to the murders.

F. Cold, Calculated, and Premeditated Aggravator

Additionally, Aguirre alleges the trial court erred in instructing the jury on the cold, calculated, and premeditated (CCP) aggravator with respect to the death of Carol Bareis. Judge Eaton instructed the jury on that aggravator, but ultimately he found that the State had not proved the aggravator beyond a reasonable doubt.
This Court has explained that the State must prove the existence of an ag-gravator beyond a reasonable doubt. See Parker v. State, 873 So.2d 270, 286 (Fla.2004). However, that heightened level of proof is not required in order to instruct the jury on an aggravator. This Court in Bowden v. State, 588 So.2d 225, 231 (Fla.1991), stated that “[w]here, as here, evidence of a mitigating or aggravating factor has been presented to the jury, an instruction on the factor is required.”
Similarly, this Court in Hunter v. State, 660 So.2d 244 (Fla.1995), held that the trial court did not err in submitting an aggravator to the jury, even though the trial court ultimately found that the aggravator was not proven beyond a reasonable doubt. This Court stated, “A judge should instruct a jury only on those aggravating circumstances for which credible and competent evidence has been presented.” Hunter, 660 So.2cl at 252. Furthermore, “because there was evidence presented that supported the cold, calculated, and premeditated aggravator, it was not error for the trial court to have instructed the jury.” Id.; see also Floyd v. State, 850 So.2d 383, 405 (Fla.2002) (holding it was not error to instruct a jury on an aggravator when there was competent evidence to support the aggravator, even though the trial court ultimately declined to find existence of the aggravator).
Here, competent, substantial evidence was presented that supported the jury instruction on the cold, calculated, and premeditated factor. Specifically, evidence was presented to demonstrate that Aguirre procured the weapon beforehand, brought it with him to the victims’ home, and committed a double homicide. Furthermore, Aguirre had the opportunity to leave without killing Bareis, but instead walked through the house and killed her with a perfectly placed knife wound to the heart. Both the procurement of a weapon and the failure to leave when given the opportunity have been repeatedly found by this Court to be competent, substantial evidence to support the CCP aggravator. See Buzia v. State, 926 So.2d 1203, 1214 (Fla.2006); Alston v. State, 723 So.2d 148, 162 (Fla.1998).
Even though the trial court did not ultimately find the existence of CCP beyond a reasonable doubt, there was competent, substantial evidence presented to give the *608 jury an instruction on the aggravator. Therefore, it was not error to instruct the jury on the CCP aggravator.

G. Avoid Arrest Aggravator

Aguirre also alleges the trial court erred in finding the aggravating circumstances that the murders were committed to avoid arrest because it was not submitted to the jury. Without addressing the trial court’s conclusion that the aggravator of commission to avoid arrest was proven beyond a reasonable doubt, or whether the aggravator could be found even though it was not submitted to the jury, we find the trial court’s action to be harmless.
Even if the witness elimination aggravator were stricken, there would still be a nine-to-three jury recommendation for the death penalty along with several other ag-gravators, including heinous, atrocious, or cruel (HAC), prior felony, and victim vulnerability, which were assigned great weight. Accordingly, any possible error was harmless because there was not a reasonable possibility that Aguirre would have received a life sentence without the trial court finding of the aggravator. See Williams v. State, 967 So.2d 735, 765 (Fla. 2007).

H. Heinous, Atrocious, or Cruel Aggravator

Aguirre further alleges the trial court erred in finding the heinous, atrocious, or cruel (HAC) aggravator with respect to Carol Bareis because there was insufficient evidence of the aggravator and she died quickly, which precludes the ag-gravator from applying. We disagree.
With respect to the HAC aggravator, this Court has held that “fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel.” James v. State, 695 So.2d 1229, 1235 (Fla.1997). This Court has also held that “the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death.” Brown v. State, 721 So.2d 274, 277 (Fla.1998). Furthermore, “the victim’s mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances.” Swafford v. State, 533 So.2d 270, 277 (Fla.1988); see also Lynch v. State, 841 So.2d 362, 369 (Fla.2003) (“[T]he focus should be upon the victim’s perception of the circumstances.... ”). And, in Buzia v. State, 926 So.2d 1203, 1214 (Fla.2006), this Court upheld the finding of the HAC aggravator and stated: “Whether this state of consciousness lasted minutes or seconds, he was ‘acutely aware’ of his ‘impending death[ ].’ We have upheld the HAC aggravator where the victim was conscious for merely seconds.”
When reviewing a trial court’s finding of an aggravator,
it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court’s job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted).
Here, the trial court found, based on the medical examiner’s testimony, that Cheryl was killed before Carol. It was determined that Aguirre left Cheryl and walked to Carol’s room, where he killed her with a *609 knife wound directly to the heart.[14] Moreover, it was established that Carol had no cognitive or hearing impairments that would have limited her awareness of her surroundings or would have prevented Carol from hearing Cheryl’s struggle with Aguirre.[15] Thus, Carol would have been able to comprehend the incredibly violent scene taking place just outside her door. Further, Carol was partially paralyzed and unable to flee the attacker in her house. Based on the evidence presented that Cheryl was killed first, Carol was stabbed while in her wheelchair, and Carol did not sleep in her wheelchair at night, it follows that Carol was aware of her daughter’s brutal murder and her own pending demise.
This Court has specifically stated that it uses a “common-sense inference” when evaluating the circumstances surrounding the killing and relating to the victim’s mental state. Lynch, 841 So.2d at 369 (quoting Swafford, 533 So.2d at 277). Common sense would indicate that an elderly woman confined to a wheelchair, who is one room away from a brutal murder, and who witnesses her attacker walk into the room, face her and stab her through the heart with a ten-inch chefs knife would be “acutely aware” of her “impending death.” Buzia, 926 So.2d at 1214.
In light of the above, there is competent substantial evidence to support the HAC aggravator. Therefore, the trial court did not err in its finding of HAC. See Francis v. State, 808 So.2d 110, 135 (Fla.2001) (upholding the finding of HAC in stabbing death of elderly twin sisters when it was not established who was killed first but this Court used common sense inference of second victim’s fear and anguish in witnessing the first attack and being aware of their demise).

I. Sufficiency

This Court reviews “the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction.” Winkles v. State, 894 So.2d 842, 847 (Fla.2005). Based on either premeditated murder or felony murder theories, we find that the evidence is sufficient to support the murder convictions.
Aguirre admitted to going inside the victims’ home, and the circumstantial evidence is clear that he did not have consent to enter. Further, Aguirre admitted to being warned on several occasions not to enter the home without an invitation. He also admitted to handling the murder weapon, which the evidence indicated was missing from his place of employment. There is also voluminous forensic evidence linking him to the murders. Aguirre’s clothes were found in a bag on the roof of his home and were covered in the victims’ blood. His shorts contained blood stains that were not contact stains and could have only arrived through motion. The murder weapon is the same make and model of a knife missing from his place of employment. Bloody footprints found inside the home match his shoes, and the blood of one of the victims was found on the soles of his shoes. Accordingly, there is sufficient evidence to support the murder convictions.

J. Proportionality

“This Court must review the proportionality of a death sentence, even if the issue has not been raised by the defendant.” Bolin v. State, 869 So.2d 1196, 1204 *610 (Fla.2004). Proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.” Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld. Davis v. State, 859 So.2d 465, 480 (Fla.2003). In addition, the heinous, atrocious, or cruel aggravator is one of the “most serious aggravators set out in the statutory sentencing scheme.” Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
Based on the evidence set forth earlier, the aggravators the trial court found, and the totality of the circumstances, both of Aguirre’s death sentences are proportional compared to other death sentences this Court has upheld. See Smithers v. State, 826 So.2d 916 (Fla.2002) (upholding both death sentences in double murder where there were three aggrava-tors found for one murder and two for the other (HAC and prior violent felony for contemporaneous murder found for both) and where there were two statutory miti-gators as well as seven nonstatutory miti-gators); Francis, 808 So.2d 110 (upholding death penalty for both stabbing murders of elderly sisters when trial court found four aggravators for each murder (HAC; victims vulnerable due to age; prior violent felony for contemporaneous murder; murders committed during the course of a robbery) and two statutory mitigators along with six nonstatutory mitigators); Morton v. State, 789 So.2d 324 (Fla.2001) (upholding both death sentences in double murder by gunshot and stabbing where trial court found three aggravators with respect to one murder and five with respect to the other (prior violent felony for contemporaneous murder and CCP found for both) and found two statutory miti-gators and five nonstatutory mitigators).

K. Conclusion

For the'reasons stated above, we affirm Aguirre’s convictions and sentences of death.
It is so ordered.
QUINCE, C.J., and LEWIS, CANADY, and POLSTON, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which LABARGA, J., concurs.
PERRY, J., did not participate.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Aguirre’s roommates also stated that the knife was similar to one that had been at their residence, which was also missing. Samantha Williams testified that her family did not own a knife of that type.

. The medical examiner testified that the second wound had all the indications of being a postmortem wound.

. Dr. Day, Aguirre's psychologist, testified during the penalty phase that Aguirre admitted to obtaining and using powder cocaine the day before the murders.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. For the murder of Cheryl Williams, Judge Eaton found the following aggravators: (1) the defendant was previously convicted of another capital felony (moderate weight); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary (moderate, but less than great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight). For the murder of Carol Bareis, Judge Eaton found the following aggravators: (1) the defendant was previously convicted of another capital felony (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of a burglary (moderate, but less than great weight); (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (great weight); (4) the capital felony was especially heinous, atrocious, or cruel (great weight); (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability (great weight).
The following mitigating circumstances were found: (1) under the influence of extreme mental or emotional disturbance (moderate weight); (2) substantially impaired ability to appreciate the criminality of his conduct (moderate weight); (3) age (24) (little weight); (4) long term substance abuse problem (moderate weight); (5) dysfunctional family setting (little weight); (6) childhood abuse (little weight); (7) poor performance in school (little weight); (8) brain damage from substance abuse (moderate weight).

.Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

.Aguirre also argues that Florida’s death sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Ring does not apply to this case because the jury's verdict on the burglary charge that was the basis, for the trial court’s finding of the “in the course of a felony” aggravator was unanimous. See Frances v. State, 970 So.2d 806, 822-23 (Fla.2007) (rejecting Ring argument in light of prior violent felony aggravator based on contemporaneous convictions for murder and robbery), cert. denied,-U.S.-, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008).
Similarly, Aguirre's allegation that the bare majority vote for death is unconstitutional is without merit. This Court has repeatedly rejected similar arguments. See Franklin v. State, 965 So.2d 79, 101 (Fla.2007) (citing multiple cases).
Additionally, Aguirre’s claim that the standard jury instructions are unconstitutional because they place a higher burden on the defendant to obtain a life sentence is without merit. See Reynolds v. State, 934 So.2d 1128, 1151 (Fla.2006) (citing multiple cases).

. Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).

. The final Nelson hearing was also a product of Aguirre’s desire for his attorneys to file a demand for speedy trial.

. Aguirre also claims that the evidence constitutes a Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), violation. However, the claims are procedurally barred as Aguirre never presented them to the court. See Kelley v. State, 974 So.2d 1047, 1051 (Fla.2007). Indeed, during the hearing, Aguirre's counsel stated “Judge, I do not have any intent and *603 my motion doesn't contain a Brady claim, and my motion doesn't contain a Giglio claim. I have no intent of bringing either one of those types of claims before this Court.”

. Aguirre admits in his brief to this Court that "defense counsel did not expressly state that the additional peremptory would be used on Weinberg,” the allegedly objectionable juror.

. Moreover, section 810.02(l)(b)2.c., Florida Statutes (2004), provides that the offense of burglary occurs when, notwithstanding a licensed or invited entry, one remains in a dwelling to commit or attempt to commit a forcible felony.

. The medical examiner also determined that Carol was facing the killer in her wheelchair when she was stabbed through the heart.

. The medical examiner testified that the struggle between Cheryl and Aguirre was “more violent than anyone in this room has seen before. It would be extremely violent.”