IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

LENNART S. KOO,

      Appellant,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

v.

CASE NO. 1D12-4866

STATE OF FLORIDA,

      Appellee.

_____/

Opinion filed September 2, 2014.

An appeal from the Circuit Court for Duval County.
James H. Daniel, Judge.

D. Gray Thomas of the Law Office of D. Gray Thomas, Jacksonville, for Appellant.

Pamela Jo Bondi, Attorney General; Wesley Cross Paxson and Jay Kubica, Assistant Attorneys General, Tallahassee, for Appellee.

ROBERTS, J.

The Appellant appeals his conviction for burglary with a firearm, arguing that the judgment below should be reversed because the trial court denied a motion for new trial without allowing an evidentiary hearing to determine the credibility and materiality of an unsworn post-trial letter authored by the alleged victim. We affirm.

The facts as gleaned from the testimony of the Appellant and the victim are as follows. The Appellant and the victim had a close relationship, which extended to celebrating holidays together and living together. The victim testified that the Appellant was not allowed to enter the storage unit without him, and the Appellant took the guns without permission. The Appellant told him he had sold the guns so the victim gave him $300 to buy the guns back. The Appellant eventually returned the AK-47 and the .44 Magnum revolver.

The Appellant testified that during November 2011, the victim became increasingly violent, and he became afraid of the victim. He further testified that on November 15, 2011, the Appellant broke into the victim's storage unit with the intention of taking the victim's guns to ensure that the victim would not use them on himself or others. The Appellant took a BB gun, an AK-47, a .22 caliber rifle, and a .44 Magnum revolver from the storage unit. The following day, the Appellant told the victim what he had done, and they agreed to meet so the Appellant could return the guns. The Appellant returned the .22 caliber rifle, the AK-47, and the .44 Magnum revolver.

The Appellant was found guilty. A month later, the victim wrote a letter to the trial court stating that, he "suddenly remembered that [the Appellant's] intent may have been motivated by something more benign than what has transpired during the trial," and "in this instance, his intentions may have been much more

2

benign than it appears." He also wrote, "The only explanation for [the Appellant] to remove the guns from the storage room may have been his desire to protect me from my own self."

The Appellant then filed a motion for new trial and argued that the letter qualified as newly discovered evidence, which required an evidentiary hearing. After hearing arguments from both parties at a hearing on the motion for new trial, the trial court denied the motion for new trial, holding that the letter did not qualify as newly discovered evidence because nothing in the letter was a recantation of the victim's trial testimony and there was nothing in the letter that was unknown to the Appellant at the time of the trial.

The denial of a motion for new trial is reviewed for abuse of discretion. Hubbard v. State, 912 So. 2d 629, 632 (Fla. 1st DCA 2005).

The Florida Supreme Court has established a two-prong standard to use when a newly discovered evidence claim is raised. Aguirre-Jarquin v. State, 9 So. 3d 593, 603 (Fla. 2009) (citing to Jones v. State, 709 So. 2d 512, 521 (Fla. 1998)). First, the evidence must be newly discovered. Aguirre-Jarquin, 9 So. 3d at 603. Second, the evidence must be material. Id. To be material, the evidence must "be of such a nature that it would probably produce an acquittal on retrial." Id. (quoting Jones, 709 So. 2d at 521).

Post-trial recantations by state witnesses are a type of newly discovered

3

evidence. Murrah v. State, 773 So. 2d 622, 624 (Fla. 1st DCA 2000). To qualify as newly discovered evidence, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Jones, 709 So. 2d at 521. Here, any evidence in the victim's letter was known to the parties, and as such, it did not qualify as newly discovered evidence.

Additionally, the evidence in the letter was not material. When determining whether the evidence would likely result in an acquittal, the court looks at whether the evidence goes to the merit of the case or whether it constitutes impeachment evidence. Murrah, 773 So. 2d at 622. Here, the letter constitutes impeachment evidence because it could have been used to call into question the credibility of the victim's testimony. See § 90.608(1), Fla. Stat. (2012) (a witness may be impeached by introducing statements of the witness that are inconsistent with his or her present testimony). To probably produce an acquittal, the letter would have to contain evidence that disproved one of the elements of burglary with a firearm. To prove the crime of burglary, the State had to show (1) the Appellant entered a structure owned by the victim; (2) at the time of entering the structure, the Appellant had intent to commit an offense; and (3) the Appellant was not permitted to enter the structure. § 812.02(1)(b), Fla. Stat. (2012). The letter did not recant any of the victim's testimony that established the elements of the crime. Because

4

this letter is not a recantation, it cannot qualify as newly discovered evidence and, as such, the trial court did not abuse its discretion.

WOLF, J., CONCURS with opinion; MAKAR, J., DISSENTS with opinion.

WOLF, J., Concurring.

As stated by Judge Roberts, the unsworn letter by the victim did not involve a recantation. In addition, the letter does not serve to nullify any element of the crime. There is no indication in the letter that the victim ever gave appellant permission to go into the storage unit and remove firearms. At the most, the unsworn letter constituted mere speculation as to appellant's motives, evidence which might be admissible at a sentencing hearing, but not at trial.

While appellant may argue the letter was evidence supporting his necessity defense, this defense fails as a matter of law. There is no evidence at trial or in the letter that the danger was imminent or that appellant did not have other reasonable options other than to break into the victim's storage unit. See Butler v. State, 14 So. 3d 269, 270-71 (Fla. 1st DCA 2009) (quoting Williams v. State, 937 So. 2d 771, 772 (Fla. 1st DCA 2006) (explaining that to be entitled to a necessity instruction, appellant must show "(1) the defendant reasonably believed that his action was necessary to avoid an imminent threat of death or serious bodily injury to himself or others; (2) the defendant did not intentionally or recklessly place himself in a situation in which it would be probable that he would be forced to choose the criminal conduct; (3) there existed no other adequate means to avoid the threatened harm except the criminal conduct; (4) the harm sought to be avoided was more egregious than the criminal conduct perpetrated to avoid it; and (5) the

6

defendant ceased the criminal conduct as soon as the necessity or apparent necessity for it ended.") (emphasis added)).

The trial court did not err in denying the motion for new trial without an evidentiary hearing.

MAKAR, J., dissenting.

Lennart S. Koo appeals from his burglary conviction arguing, in part, that the trial judge erred by not holding an evidentiary hearing despite having received a letter from the alleged victim, Dr. Mohamed Saleh, who had testified as the key witness for the State. Because Dr. Saleh's letter raised sufficient grounds to warrant an evidentiary hearing under the circumstances, it was error to deny Koo's motion seeking one.

Koo was convicted of one count of removing firearms from a storage unit owned by Dr. Saleh, resulting in a ten-year minimum mandatory sentence. Dr. Saleh and Koo had a close personal relationship, one akin to family members (Dr. Saleh said he loved Koo "like my own brother."). Likewise, Koo characterized Dr. Saleh as a "boss and friend" for whom he'd worked almost full-time for the past four years. Koo, who was born in Amsterdam, Netherlands, and whose primary language is Dutch, was introduced to Dr. Saleh by Koo's father (whom Dr. Saleh treated as a family member and wished "was my brother.").

Koo lived in Dr. Saleh's home while doing a wide range of jobs such as working in the physician's office; chauffeuring the physician around town in either "his limousine or one of his trucks" as needed; constructing a home theater, swing set, and other similar tasks, resulting in workdays of between 10 and 15 hours. Koo

8

also regularly babysat Dr. Saleh's three daughters. He was essentially the physician's personal assistant ("What he said I did."). Koo testified that he worked at and had keys to Dr. Saleh's office, his houses, his beach house, the storage unit, and his cars ("He loses everything so that's why I had all the keys.").

At trial, Dr. Saleh testified that on November 14, 2011, he took Koo with him to put guns in the storage unit, where he also stored clothing. He testified that Koo did not have keys to the physician's properties, and that Koo took firearms from the storage unit soon thereafter. He received a call the next day from Koo's mother about the firearms, which Koo and his mother returned the following day.[1]

Koo's defense was twofold. First, Dr. Saleh had effectively given him consent to access the storage unit. Because of their close relationship, Koo testified he was Dr. Saleh's "right hand man" to whom the physician had entrusted the keys to his house and other properties (including the storage unit) as well as his personal vehicles. Koo said he was never told that Dr. Saleh had to be present when Koo went to these properties. Koo believed he had the authority to enter the storage unit.

Second, Koo asserted a necessity defense, claiming it was necessary to keep the firearms out of Dr. Saleh's hands because he had threatened to kill Koo; Dr.

---

[1] Dr. Saleh testified that Koo said he had sold the weapons, and that he gave Koo $300 to buy them back.

Saleh had also threatened to harm his own wife. Koo testified that in November 2011, Dr. Saleh—who was going through a divorce and custody case— "became increasingly violent and threatening" going so far as to threaten Koo at knifepoint and another employee at gunpoint. Around this same time, on November 14, 2011, Koo went to the storage unit with Dr. Saleh, who had forgotten his key. They opened the lock with wire cutters, and—after Dr. Saleh told Koo to take some dresses for his girlfriend—Koo put a new lock on the unit. According to Koo, Dr. Saleh's behavior soon became very erratic and threatening; the physician kicked him out of the house. Dr. Saleh told Koo, "If I ever see you around here, I will kill you, and I will kill your family." Koo was terrified that Dr. Saleh was going to shoot him, so he went to the storage unit to get and safeguard the guns. Koo's intention was to keep himself safe until Dr. Saleh calmed down. Because Koo did not have the key with him, he broke the lock off. He took the guns to a friend's business, but after talking with his mom, decided to return them to Dr. Saleh. Koo says that Dr. Saleh threatened to report him to the police unless Koo moved back in with him and completed work on a website (besides a handyman, Koo is also a computer programmer). A week or so later, Dr. Saleh spent Thanksgiving with Koo and Koo's parents at their home (Dr. Saleh says the gun issue was not discussed, the Koos saying he "changed his mind" and that the matter had been resolved at the Thanksgiving dinner).

On July 25, 2012, the jury found Koo guilty of burglary with the additional sentencing factor that Koo was in actual possession of a firearm during the commission of the burglary, triggering a mandatory ten-year sentence. The jury sent a note to the trial judge requesting leniency in Koo's sentencing. The note said: "Judge Daniel, we followed the letter of the law and that's what we did, but we would like to ask for leniency. We are not trying to do your job, but you said we can ask you anything. This is what we are asking."

Koo moved for a new trial, but soon filed an amended motion for new trial or hearing based on a post-verdict letter sent by Dr. Saleh to the trial judge. In his letter, Dr. Saleh contradicted his trial testimony, saying that he had allowed Koo to have "keys to every dwelling." He said he had "suddenly remembered" that Koo's intent in removing the firearms "may have been motivated by something more benign than what has transpired at trial." He said Koo's removal of the firearms—when Koo could have taken far more valuable items from the storage unit or the physician's home—was done to protect Dr. Saleh from doing "something that I might regret." The physician said that the "only explanation" for Koo's actions was "to protect me from my own self." He noted that Koo and Koo's parents were like family, and that he had needed Koo to keep the physician's wife from "sending me over the edge."

11

Following a conviction, a new trial may be granted if "[n]ew and material evidence, which, if introduced at the trial would probably have changed the verdict or finding of the court, and which the defendant could not with reasonable diligence have discovered and produced at the trial, has been discovered." Boyd v. State, 910 So. 2d 167, 178 (Fla. 2005); Fla. R. Crim. P. 3.600(a)(3). "Recantation evidence is considered to be a type of newly discovered evidence, and therefore, the same test applies to recantation evidence as to other types of newly discovered evidence." Stephens v. State, 829 So. 2d 945, 945-46 (Fla. 1st DCA 2002). In Stephens, one of the state's witnesses recanted her testimony, but the trial court denied a postconviction motion seeking a new trial without an evidentiary hearing. Id. at 945. This Court reversed, explaining that an evidentiary hearing is necessary unless the recantation (which was in the form of an affidavit) is "inherently incredible or obviously immaterial to the verdict." Id. at 946. The determinations to be made after such a hearing are whether the witness is now testifying truthfully, and if so, whether the new testimony would probably produce an acquittal if used in a retrial. Id.; see also Glendening v. State, 604 So. 2d 839, 840-41 (Fla. 2d DCA 1992).

Applying Stephens, a hearing was required unless Dr. Saleh's letter was "inherently incredible or obviously immaterial to the verdict." It was neither. On the record presented, one could glibly conclude—as the trial judge (perhaps

12

justifiably) seems to have done—that anything Dr. Saleh says is "inherently incredible" due to his volatile and vacillating prevarications ("I don't place a lot of credibility in Dr. Saleh, quite candidly."). This was reason enough to have held a hearing; if a key witness has serious credibility issues, that's strong evidence that he probably lied at trial, making it far better to err on the side of caution by holding a hearing to ferret out which version of reality is to be credited. Because serious doubt exists about Dr. Saleh's credibility, the integrity of Koo's conviction is seriously compromised, making a hearing that much more important.

The jury could not have convicted Koo without Dr. Saleh's testimony, which it apparently found credible, at least as to some material respects now shrouded in doubt. Likewise, Dr. Saleh's recantation letter may be credible, at least as to the portions related to Koo's consent and necessity defenses, which are material to the verdict. Under these circumstances, when the State's star witness recants a material portion of his testimony that goes to two key defenses in an exceptionally close case in which the jury expressed reservations (if not remorse) about its verdict—beseeching the trial judge to be lenient on the defendant—it was an abuse of discretion not to at least hold a hearing on the matter. See Hubbard v. State, 912 So. 2d 629, 632 (Fla. 1st DCA 2005) (denial of a motion for new trial reviewed for abuse of discretion). Koo's request for a hearing is an exceptionally modest one given his liberty interest is at stake; his freedom for the next ten years has been

13

taken away based on the disavowed testimony of Dr. Saleh, a person that even the trial judge had difficulty believing. A remand for an evidentiary hearing under Stephens is necessitated; whether a new trial is warranted would depend upon the results of that hearing. Koo is entitled to this minimal degree of due process before the State can take away a decade of his life.