# Supreme Court of Florida

_____

No. SC13-1550
_____

**DELMER SMITH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[July 9, 2015]

PER CURIAM.

Delmer Smith, who was thirty-eight years old at the time of the crime, was convicted of the August 3, 2009, first-degree murder of Kathleen Briles, which occurred during a home invasion and robbery. In this proceeding, Smith appeals his conviction and the sentence of death that the trial court imposed for this murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Smith's conviction for first-degree murder and his sentence of death.

**FACTS**

On the afternoon of August 3, 2009, Kathleen Briles was accosted outside of her home in Manatee County, after returning from grocery shopping. Briles was then dragged inside her home, where she was bound, gagged, and beaten to death with her own antique twenty-three-pound cast iron sewing machine. Numerous items were stolen from the home.

The victim's husband, Dr. James Briles, returned home at about 7:30 p.m., after completing his rounds at the hospital, and found his deceased wife. When he first arrived, he noticed that his wife's car was not parked in its usual spot closest to their home and that all of the lights inside the home were off. After turning on the lights, he saw his wife lying facedown on the floor in front of the love seat, her ankles and hands bound with duct tape. The victim had a duct tape gag around her mouth, and she was lying in a pool of blood. Her left jaw and head were deformed, and the antique cast iron sewing machine was on the ground behind her head.

According to Dr. Briles, it appeared as if somebody had gone through their belongings and had closed the window blinds, which were usually open. The furniture was moved around, drawers and doors had been opened, and even their outdoor shed had been breached. Approximately $30,000-$40,000 worth of jewelry was missing, including the victim's wedding band and a diamond baguette necklace that Dr. Briles had purchased for his wife years before. Further, while the

victim had been seen wearing a watch earlier that day, she was not wearing a watch when she was discovered. Dr. Briles identified many unique items that were missing from the house, including a rare set of nickels a patient had given him, an old medical encyclopedia that the victim purchased at a yard sale, and a pewter Minnie Mouse keychain produced by Hudson Creek—a company that went out of business years ago.

The victim's purse was found on the front seat of her car, along with a Publix supermarket receipt that indicated the victim had purchased groceries that afternoon. Her groceries, which included frozen and refrigerated items, were still in the trunk of her car. Video surveillance from the Publix store showed the victim leaving the store with a cart full of groceries at 3:36 p.m. that afternoon and her car leaving the parking lot a couple of minutes later. Her house was located only minutes away from the store.

Dr. Wilson Broussard, the medical examiner, performed an autopsy on the victim, which established that she was killed between noon and 8:00 p.m. on August 3. She was bound with duct tape before she was killed and had sustained numerous blows to the back of her head that were consistent with being hit by the antique sewing machine. In particular, she had sustained a significant blow consisting of a single impact on one part of her head, in addition to a minimum of four to five blows to the right side of her head and another four to five blows to

another portion of her head. In fact, the victim's skull was so damaged by these blows that brain matter was visible. Further, she had an eyebrow injury and a fractured jaw that could have been caused indirectly when blows to the back of her head caused the front of her head to impact the floor.

In addition to the injuries to her head, the victim had a few abrasions around her shoulders, a bruised elbow that could have been caused by a direct blow or rolling on top of her elbows, and a lacerated liver that was likely caused by a kick or blow to her abdomen. Dr. Broussard testified that based on his review of the victim and the crime scene, the victim was lying facedown on the floor while she was hit multiple times with the sewing machine. The blows caused numerous lacerations to her scalp, resulting in a large volume of blood found at the crime scene. Dr. Broussard believed that most of the injuries occurred while the victim was alive. However, he was unable to determine how long the victim remained conscious after the first blow to her head. Richard Talbot, the crime scene unit manager with the Manatee County Sheriff's Office, also testified that the blood stains found at the crime scene were consistent with the victim being close to the ground when she was struck.

On the day after the murder, Smith picked up a friend, James Cellecz, in his Chevy Blazer, and the two ran some errands together. Afterwards, they stopped at Pawn Stars, a pawn shop. Smith told Cellecz that he wanted to pawn some jewelry

he had purchased from a friend but had forgotten his identification, so Smith asked Cellecz if Cellecz could pawn the items for him. One of the items was the diamond baguette necklace that was later identified as belonging to the victim. Cellecz agreed to pawn the items, and they both went into the store together. Cellecz obtained Smith's permission to accept the price he was offered by the pawn store clerk for the necklace. During this trip, Cellecz noticed that Smith had a medical encyclopedia on the floor of his vehicle, which Cellecz thought was odd because Smith did not have any knowledge of medicine.

At trial, Cellecz testified that Smith usually carried a black backpack that contained a ski mask, gloves, and a roll of gray duct tape in it. Cellecz expressly denied breaking into the Briles's home and killing the victim. He further denied collaborating with anybody to frame Smith for the crime.

Smith was arrested on February 11, 2010. Following his arrest, he called Martha Tejeda on multiple occasions, asking her to pick up two duffle bags that were in storage. Tejeda went to the storage shed and retrieved some of Smith's belongings, including a red duffle bag that Smith requested. Before she hid the bag in her attic, she noticed that there was a lock box inside the bag. She also retrieved Smith's vehicle. When the police arrived at her home, she gave them Smith's vehicle, and the next day, she gave them the duffle bag. Inside the bag was a lock box that contained a coin collection in a plastic container, a Minnie

Mouse keychain, a gold-colored lock, and a watch—all items that had been stolen from the Briles's home.

At trial, Dr. Briles identified the items from the duffle bag, including the unique coin collection and the uncommon pewter Minnie Mouse keychain, even producing a receipt for the keychain. Attached to the Minnie Mouse keychain were keys to a vehicle that Smith owned. The medical encyclopedia was also recovered, and a fingerprint within the book was matched to Smith. None of the prints within the book matched the Briles or Cellecz. Both Dr. Briles and his son, Dr. Calvin Briles, identified the medical encyclopedia found with Smith's belongings as the one that the Briles had owned.

Michelle Quinones was Smith's girlfriend, and they lived together at the time of the crime. At some point, Smith gave Quinones a set of his vehicle's keys, which were on a Minnie Mouse keychain. Smith also showed Quinones a his-and-her watch set, and she put one of the watches in her jewelry box. Smith moved out in August 2009 and took many of his possessions with him, including a backpack that contained a black hoodie, a black ski mask, screwdrivers, and pliers. Quinones later placed the watch that Smith gave her in a trash bag and called the police to come and pick it up, which an officer did. At trial, she identified the watch that Smith gave her.

The State presented evidence to establish that on 3:44 p.m. on the day of the murder, Smith's cell phone was at a location close to where the murder took place—a fact that was established when Smith's cell phone received a call that went unanswered and records indicated that his cell phone used a cell tower that was 1.24 miles away from the victim's home. This timing was particularly striking because the victim had left Publix at 3:38 p.m. and lived only a few minutes away from the store. Cell phone records further demonstrated that both before and after this time, Smith's cell phone was located close to where Smith lived in Sarasota County. The State also called numerous people who had called Smith's cell phone number or had received a phone call from Smith's cell phone number on the day of the murder. While none of the witnesses could recall specific telephone calls they made on August 3, nobody reported receiving a call from Smith's number from a person other than Smith. Similarly, nobody recalled calling Smith and having anyone other than Smith answer the call.

Finally, the State presented evidence demonstrating that, after both Smith and Cellecz were in jail, Smith met another inmate, Joshua Hull, and learned that Hull was housed near Cellecz and knew him. Smith asked Hull to pass along a message to Cellecz that Smith had "something for his ass" and that he knew where Cellecz's wife and child were and had "something for them," as well. When questioned why Smith was asking Hull to pass along the messages, Hull testified

that Smith was upset at Cellecz because Smith had given Cellecz some "jewelry and stuff" to pawn and Cellecz was "snitching" on Smith.

The jury convicted Smith of first-degree murder.

At the penalty phase, the State presented evidence that Smith had prior violent felony convictions (a 1991 state robbery conviction and 1995 federal convictions for armed bank robbery and carrying a firearm during a crime of violence). The State then established that Smith was on felony probation at the time of the murder based on his 1995 federal convictions. Further, the State presented evidence that on March 14, 2009, Smith committed a home invasion in Sarasota where he entered the home of a different victim at approximately 10 p.m., wearing a mask and gloves, and threatened to kill the victim. After he forced her through the house in a search for valuables to steal, Smith bound her hands behind her back, bound her ankles, and wrapped the binding around her neck so she would strangle herself if she moved her legs. The State also presented victim impact statements from two of the victim's family members: Diane Brinker (the victim's sister) and Dr. James Briles (the victim's husband).

Smith presented testimony from two of his nieces, who are close to Smith and testified how Smith provided guidance and helped them. Smith also presented testimony from a psychologist, Dr. Hyman Eisenstein. Dr. Eisenstein reviewed Smith's background and various records and testified about Smith's dismal

progress in school, including the fact that he repeated grades so often in elementary school that he was fourteen years old when he was in the fifth grade and was then promoted to the ninth grade for special education. A report indicated that, during his childhood, Smith had been physically and emotionally abused by both of his parents and suffered sexual abuse by his father.

Dr. Eisenstein noted that Smith was in a motorcycle crash that caused some head trauma. Dr. Eisenstein opined that Smith has attention deficient disorder (hyperactivity), academic failure, and unequivocal brain damage. While Dr. Eisenstein recognized that Smith could have met the definition of antisocial personality disorder, he believed Smith had intermittent explosive disorder instead. Further, Dr. Eisenstein testified that Smith's decision-making ability was profoundly impaired and his judgment, reasoning, executive functioning, and higher critical processing of information were three to four standard deviations below the norm. Dr. Eisenstein stressed that Smith had excellent behavior in prison—a controlled environment where self-control is not as necessary. Dr. Eisenstein concluded that Smith committed the murder while under the influence of an extreme mental or emotional disturbance and that Smith's ability to appreciate the criminality of his conduct or conform to the requirements of law was impaired.

In rebuttal, the State called Dr. Wade Myers, a medical doctor and professor in the psychiatry department at Brown University. Dr. Myers reviewed Smith's records and Dr. Eisenstein's report, including the raw data underlying that report. Dr. Myers disagreed that Smith had impulse problems, noting that Smith did not have any records of being in fights while he was in prison and that Smith exercised self-control during the prior Sarasota home invasion. However, Dr. Myers diagnosed Smith with antisocial personality disorder.

The jury unanimously recommended that Smith be sentenced to death. The trial court conducted a <u>Spencer</u>[1] hearing, during which Smith presented the testimony of Dr. Ruben Gur, a psychologist who specialized in neuroimaging. Dr. Gur reviewed Smith's MRI and asserted that Smith's brain had tissue loss and opined that Smith had brain damage on the right side and in the orbital frontal area of his brain. In reviewing Smith's PET scan, Dr. Gur testified that some areas showed hyper-metabolism, which can cause brain damage because toxic chemicals are released, while other portions of Smith's brain showed decreased metabolism. These abnormalities would cause deficits in the ability to experience normal emotions and affect his self-control. Dr. Gur concluded that based on these issues,

---

1. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

Smith's "thinking brain" was hyperactive at the resting state and that if Smith felt threatened, his "thinking brain [would] become deactivated."

Smith also recalled Dr. Eisenstein, who reaffirmed his conclusion that Smith has brain damage. He also stated that Smith had a "very primitive amygdala melt-down response," which hindered his ability to modulate emotional responses and respond appropriately in high stress situations, including the ability to walk away from difficult situations.

The State then called Dr. Helen Mayberg, a board certified neurologist with a strong background in neuroimaging. Dr. Mayberg disagreed that a PET scan could be used as a "general screening test," testifying that a PET scan can be influenced by the level of anxiety present at the time of testing and noting that Smith had complained of anxiety shortly before the testing. Dr. Mayberg further emphasized that she was unaware of any medical professional who used Dr. Gur's method of analysis to reach a medical diagnosis. According to Dr. Mayberg, Smith's PET scan was "very normal looking" and showed no areas of brain damage. She further disagreed that Smith had a demonstrated impulse control problem, testifying that brain damage to the frontal lobe affects all aspects of a person's life, as opposed to the very narrow circumstances present in Smith's record.

After considering the evidence presented during the penalty phase and the Spencer hearing, the trial court found that the aggravating circumstances "overwhelme[d]" the mitigating factors. The trial court found that five aggravating circumstances applied and assigned each the following weight: (1) Smith was on felony probation (moderate weight even though the murder occurred less than a year from the date of Smith's release from prison); (2) Smith had prior violent felony convictions (great weight as to the 1991 state robbery conviction and the 1995 federal armed bank robbery convictions and noting that the court would also assign great weight to the Sarasota home invasion armed robbery conviction if that conviction was upheld on appeal[2]); (3) the murder was committed in the course of a burglary (moderate weight); (4) the murder was committed for pecuniary gain (no weight because it merged with the committed-in-the-course-of-a-burglary aggravator); and (5) the murder was especially heinous, atrocious, or cruel (HAC) (great weight).

The trial court, however, rejected both of Smith's proposed statutory mitigators: (1) Smith committed the murder while under the influence of an extreme mental or emotional disturbance; and (2) Smith's capacity to appreciate

---

2. The Sarasota home invasion armed robbery conviction has since been upheld on appeal. See Smith v. State, 147 So. 3d 997 (Fla. 2d DCA 2014) (table decision).

the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. In making this finding, the trial court recognized that the State's expert witness testimony "conflicted radically" with the defendant's expert witness testimony and found the State witnesses to be "more persuasive and convincing." The trial court did find that five nonstatutory mitigating factors applied and assigned each the following weight: (1) intermittent explosive disorder (moderate weight); (2) loving relationship with nieces (little weight); (3) physical, emotional, and sexual abuse as a child (little weight); (4) acute academic failure and attention deficit disorder (significant weight); and (5) good conduct while in custody (moderate weight).

Based on these findings, and in accordance with the jury's unanimous recommendation, the trial court sentenced Smith to death. This direct appeal follows.

## ANALYSIS

Smith asserts that he is entitled to relief because: (1) the trial court erred in denying his motion for judgment of acquittal; (2) the trial court erred in denying a motion for mistrial; (3) the trial court erred in permitting inmate Hull to testify as to the threat that Smith made to a witness, Cellecz, through Hull; (4) the trial court erred in denying a continuance; (5) the trial court erred in finding HAC; (6) the trial court erred in rejecting the two proposed statutory mitigators; and (7)

Florida's death penalty scheme is unconstitutional. We address each of these claims in turn, and in addition, we review whether the sentence of death is proportional in this case.

## I. Denial of Motion for Judgment of Acquittal

In his first challenge, Smith asserts that the trial court erred in denying his motion for judgment of acquittal because the State presented insufficient evidence to establish his guilt. "A trial court should not grant a motion for judgment of acquittal 'unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.' " Jackson v. State, 25 So. 3d 518, 531 (Fla. 2009) (quoting Coday v. State, 946 So. 2d 988, 996 (Fla. 2006)). "In reviewing the denial of a motion for judgment of acquittal, appellate courts apply a de novo standard of review and do not reverse a conviction where the conviction is supported by competent, substantial evidence." Id. "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

As the conviction in this case is based wholly upon circumstantial evidence, a special standard of review applies. "Where the only proof of guilt is

circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." Gosciminski v. State, 132 So. 3d 678, 710 (Fla. 2013) (quoting State v. Law, 559 So. 2d 187 (Fla. 1989)), cert. denied, 135 S. Ct. 57 (2014). The State need not " 'rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." Id. (quoting Law, 559 So. 2d at 189). Once this requirement is met, "it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." Id. Appellate courts will sustain a conviction based solely on circumstantial evidence so long as the evidence is "(1) 'consistent with the defendant's guilt' and (2) 'inconsistent with any reasonable hypothesis of innocence.' " Delgado v. State, 948 So. 2d 681, 689-90 (Fla. 2006) (quoting Orme v. State, 677 So. 2d 258, 261 & n.1 (Fla. 1996)).

We conclude that the record contains competent, substantial evidence to support Smith's conviction for the first-degree murder of Kathleen Briles and that the trial court did not err in denying the motion for judgment of acquittal. Smith asserts that he is innocent of the crime and that either Cellecz or somebody else committed the murder. However, the State presented evidence that contradicted Smith's hypothesis of innocence. Specifically, the State presented evidence to

establish that on the day after the murder, Smith possessed a medical encyclopedia, which was seen on the floorboard of his vehicle. This book was later found with Smith's possessions and had one of his fingerprints in it. The Briles were able to positively identify the book based on specific characteristics, including the location of a crease in the cover, and identified pictures of the book in their house before the murder, which permitted the jury to compare the book in the Briles's home with the book found among Smith's possessions. Moreover, the day after the murder, Cellecz testified that Smith asked him to pawn the victim's necklace, claiming he bought it from a friend. Cellecz pawned the necklace, and the victim's husband later positively identified it as belonging to the victim based on unique flaws in the necklace.

Further, testimony was presented that Smith was in possession of other items stolen from the home. After Smith was arrested, he called a friend and asked her to remove several bags from his storage facility, which she did, but subsequently turned these items over to the police. One of the bags contained numerous items that had been stolen at the time of the crime, including a special set of coins and the Minnie Mouse keychain, which was connected to the keys for a vehicle that Smith owned. Each of these items was unique and specifically identified by Dr. Briles, the victim's husband.

Regarding the timing of the murder and Smith's whereabouts, the evidence established that the victim left Publix with frozen groceries in her trunk on August 3 at 3:38 p.m. and never removed the groceries. At 3:44 p.m. on the same day, Smith's cell phone received a call that he never answered. The call was relayed through a cell tower that was approximately a mile from the victim's home in Terra Ceia, a town in Manatee County. However, calls received prior to and after that time were relayed though cell towers in Sarasota County, close to where Smith lived.

Smith's theory of defense was that either Cellecz or another person had killed the victim. To rebut this theory, the State called Cellecz, who testified that he did not break into the victim's home, but that he had received the stolen items he later pawned from Smith the day following the murder. Further, Hull testified that Smith was upset with Cellecz because Smith had given Cellecz some jewelry to pawn and Cellecz "snitched" on Smith. While Smith disputes the weight and credibility of this evidence, it nevertheless constitutes competent evidence that is inconsistent with Smith's theory of events and it was up to the jury to resolve these inconsistencies. In addition, the State's evidence that Smith provided the victim's necklace to Cellecz to pawn the day after the murder, as well as evidence that Smith gave his girlfriend a unique Minnie Mouse keychain that had belonged to

the victim, likewise constitutes competent evidence that is inconsistent with Smith's theory of events.

In reviewing all the evidence presented in the light most favorable to the State, as well as Smith's hypothesis of innocence, we conclude that competent, substantial evidence supports the jury's finding of guilt and is inconsistent with any reasonable hypothesis of innocence. Accordingly, we conclude that the trial court did not err in denying the motion for judgment of acquittal.

## II. Denial of Motion for Mistrial

Smith next contends that the trial court erred in denying his motion for mistrial after a witness revealed another investigation that was occurring in a different jurisdiction. Specifically, Smith objected to the following testimony from Detective Linda Deniro, a police officer with the City of Sarasota, who participated in an investigation involving Smith:

> Q. As part of that investigation did you speak to someone named Michele Quinones?
> A. I did.
> Q. And did she give you some of the defendant's property?
> A. Yes, she did.
> Q. How did that exchange come about?
> A. Regarding my investigation that I was doing for the City of Sarasota—
> Q. Well let me stop you there. What I meant was, did she call you, did you call her, how did she give you the property?
> A. Oh, I called her, we talked, and she said she had some property she would like to turn over to the Sarasota Police Department. At that time I—

- 18 -

At that point, defense counsel objected and moved for a mistrial on the basis that the detective referred to an investigation for the City of Sarasota in an unrelated case. The trial court denied the motion, stating:

> It was a very poor choice of words by the detective. After 23 years in the force, she should have known better than to talk like that. I believe her exact words, we can look it up, but I believe her exact words was the investigation I was doing for the City of Sarasota. "Regarding my investigation that I was doing for the City of Sarasota" is exactly what she said.
>
> All right, in light of the fact that investigations were being conducted in multiple cities, and by multiple agencies, I don't think the jury would draw the inference that there was a separate investigation that this officer was working on behalf of the City of Sarasota for. While that is certainly a possible inference that could be drawn, in the context of this case I don't find that it rises to the level that would require a mistrial. Motion is denied.

The trial court should grant a motion for mistrial only "when an error is so prejudicial as to vitiate the entire trial." Jackson, 25 So. 3d at 528 (quoting Salazar v. State, 991 So. 2d 364, 372 (Fla. 2008)). "[T]his Court reviews a trial court's ruling on a motion for mistrial under an abuse of discretion standard." Id. (quoting Salazar, 991 So. 2d at 371).

Although Smith alleges that Detective Deniro informed the jury that Smith was being investigated for other crimes, we disagree that this marginal reference to an investigation for the City of Sarasota informed the jury about other crimes. Detective Deniro referenced only "an investigation" she was performing for the City of Sarasota. At that point, the prosecutor immediately stopped her and

- 19 -

redirected the question, asking Detective Deniro how she received property from Michele Quinones. In response, Detective Deniro stated that she had called Quinones and Quinones said that she had property that she wanted to turn over to the Sarasota Police Department.

While the trial court acknowledged that it was a "very poor choice of words," the trial court also observed that it did not believe that the "jury would draw the inference that there was a separate investigation." If, for some reason from this passing reference, the jury would have concluded there was a separate investigation, nothing within the detective's statement informed the jury about the nature of any investigation or implied that Smith was the focus of the investigation. The State stopped the witness, and there was no further mention by the State or any other witnesses of multiple investigations.

We conclude that the trial court did not abuse its discretion in denying the motion for mistrial on the basis of this isolated reference. Accordingly, we deny this claim.

### III. Objections to Hull's Testimony

In his third claim, Smith contends that the trial court erred in overruling his objections to testimony from Hull concerning threats that Smith asked Hull to relay to Cellecz. "This Court reviews evidentiary rulings for abuse of discretion." Gregory v. State, 118 So. 3d 770, 780 (Fla. 2013). However, "[a] judge's

discretion is limited by the rules of evidence and by the principles of stare decisis." Id. (quoting Johnson v. State, 969 So. 2d 938, 949 (Fla. 2007) (citation omitted)).

At trial, the trial court permitted the State to present Hull as a witness over defense objection. Hull testified that while he resided at the Manatee County Jail, he met Smith on the transportation bus when they were both returning to the county jail after a trip to the courthouse. Smith asked Hull where he was housed, and after learning that Hull was housed in the G2 West Unit, Smith then inquired whether Hull knew an inmate named James Cellecz. After Hull acknowledged that he knew Cellecz, Smith told Hull to relay a message to Cellecz that Smith had "something for his ass." Smith then said that he knew where Cellecz's wife and child were and that he had "something for them." Hull explained that Smith wanted him to relay this message to Cellecz because Smith was upset at Cellecz after Smith had given Cellecz some "jewelry and stuff" to pawn and Cellecz was "snitching" on Smith.

Smith acknowledges that he presented only two arguments to the trial court: (1) the evidence was inadmissible because it was evidence pertaining to a collateral, uncharged crime; and (2) the prejudicial impact outweighed any probative value. However, Smith now asserts that the statements were too vague to be considered threats and nothing linked his statements to Hull with the murder.

We conclude that Smith has failed to properly preserve his objection to the trial court's admission of Hull's testimony.  As this Court has held, "in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."  Carmichael v. State, 715 So. 2d 247, 248 (Fla. 1998) (quoting Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982)).  As Smith failed to present this ground to the trial court, we conclude that this claim is waived.

Even if this Court were to consider this claim on the merits, however, Smith has failed to show that the trial court abused its discretion in admitting the evidence.  This Court has long recognized that "a defendant's attempt to intimidate a state witness is relevant and admissible."  England v. State, 940 So. 2d 389, 401 (Fla. 2006) (quoting Heath v. State, 648 So. 2d 660, 664 (Fla. 1994)).  As this Court explained, "such evidence is based on consciousness of guilt inferred from such actions."  Id.  In England, the defendant told a witness that if a codefendant "got me in trouble, I would kill him."  Id.  That statement was held admissible.  Id.; see also Anderson v. State, 574 So. 2d 87, 93 (Fla. 1991) (holding that a threat was relevant and admissible even though the defendant did not link his attempt to kill the witness to the possibility of the witness testifying in court against him).

In this case, Hull's testimony was relevant because it established that Smith was attempting to intimidate a State witness—evidence that could support

consciousness of guilt.  Moreover, Hull testified that Smith was upset at Cellecz because Cellecz was "snitching" on him after Smith gave Cellecz certain jewelry to pawn—relevant evidence that was also in dispute.  While Smith asserts that the evidence was vague and unreliable, this goes to the weight that a jury might assign to such evidence and not to its admissibility.  We thus reject this claim.

## IV.  Denial of a Continuance

In his next claim, Smith argues that the trial court erred in denying his July 20, 2012, motion for continuance that was based on two factors: (1) defense counsel sought its own fingerprint expert to test the medical encyclopedia; and (2) defense counsel was considering calling Alex Ramos, a federal inmate who was allegedly important to Smith's claim that the medical encyclopedia was from a federal prison.  As this Court has stated, "[a] court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown." Snelgrove v. State, 107 So. 3d 242, 250 (Fla. 2012) (quoting Doorbal v. State, 983 So. 2d 464, 486 (Fla. 2008)).  This standard is generally not met "unless the court's ruling on the continuance results in undue prejudice to the defendant."  Id.  If the motion for continuance concerns the absence of a witness, "the defendant must show: (1) prior due diligence to obtain the witness's presence; (2) substantially favorable testimony would have been forthcoming; (3) the witness was available and willing to testify; and (4) the denial of the continuance caused material

prejudice." Mosley v. State, 46 So. 3d 510, 525 (Fla. 2009). "While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance." Doorbal, 983 So. 2d at 486 (quoting Hernandez-Alberto v. State, 889 So. 2d 721, 730 (Fla. 2004)).

In this case, defense counsel was appointed approximately twenty months prior to trial. Nearly six weeks before trial, defense counsel filed a motion to compel fingerprinting, asking the trial court to compel the State to inspect each page of the medical encyclopedia for fingerprints and alleging a good faith belief that this would produce exculpatory evidence by comparing any fingerprints found to known fingerprints in the federal fingerprinting database. The trial court granted this motion.

On the eve of trial, defense counsel attempted to continue the case, after two continuances were previously granted. Initially, defense counsel asserted that this late request was necessary based on new cell phone records and witnesses recently disclosed by the State. The State clarified that the information it would be presenting at trial was not new evidence that was recently disclosed and explained that the State would be inquiring only whether the witnesses knew if a person other than Smith used Smith's cell phone on the day of the murder. At that point, defense counsel changed the underlying basis of the motion to continue, asserting

- 24 -

that the defense should be able to obtain its own fingerprint expert. The trial court denied the motion, finding that the request seemed to be "simply a delay tactic." The trial court also noted that to the extent defense counsel made a vague suggestion requesting its own fingerprint expert, such a motion was never reduced to writing.

Defense counsel subsequently amended his motion to continue, specifically requesting a fingerprint expert. When the trial court questioned the necessity of that request, defense counsel again attempted to modify the basis for the request for a continuance, suggesting that the defense needed time to secure Alex Ramos as a witness. Defense counsel, however, never proffered what testimony Ramos would have provided. Apparently, Ramos was previously in federal prison with Smith and presumably would have testified that the medical encyclopedia was obtained from the federal prison. But Smith has never pointed to any identifying information on the medical encyclopedia to support that it was the property of the federal prison, while the medical encyclopedia was positively identified by the victim's husband and son as belonging to the Briles. Further, the first time the medical encyclopedia was seen in Smith's possession was the day after the murder.

Based on this record, we hold that Smith has failed to show any abuse of discretion in the denial of the motion to continue or any specific prejudice as a result. As it pertains to the medical encyclopedia, based on a specific request from

Smith's attorney, the fingerprint expert retained by the State reviewed every page within the book for fingerprints and Smith fails to allege how another examination of the book would have assisted his defense. Defense counsel's only objection is the fact that the State's expert was unable to match the fingerprints to any exculpatory evidence and thus Smith wanted to hire his own expert in order to determine whether a different expert could obtain a different result. For all these reasons, we conclude that no abuse of discretion has been shown and reject this claim of error.

### V. Finding of HAC

Smith's first claim of penalty-phase error consists of a challenge to the trial court's finding that the HAC aggravator applies. The State bears the burden to prove each aggravating circumstance beyond a reasonable doubt. Williams v. State, 37 So. 3d 187, 194-95 (Fla. 2010). "When reviewing a trial court's finding of an aggravator, 'it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court's job.' " Williams, 37 So. 3d at 195 (quoting Aguirre-Jarquin v. State, 9 So. 3d 593, 608 (Fla. 2009)). Rather, on appeal, this Court must "review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether

competent substantial evidence supports its finding." Id. (quoting Aguirre-Jarquin,

9 So. 3d at 608).

This Court has defined the HAC aggravator as follows:

It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

Hernandez v. State, 4 So. 3d 642, 668-69 (Fla. 2009) (quoting State v. Dixon, 283

So. 2d 1, 9 (Fla. 1973)). While this Court has upheld HAC in beating deaths such

as this case, "the evidence must show that the victim was conscious and aware of

impending death." Douglas v. State, 878 So. 2d 1246, 1261 (Fla. 2004); see also

Zakrzewski v. State, 717 So. 2d 488, 493 (Fla. 1998) (holding that it was error for

the trial court to find HAC because "[m]edical testimony was offered during the

trial which established that [the victim] may have been rendered unconscious upon

receiving the first blow from the crowbar, and as a result, she was unaware of her

impending death").

In this case, the trial court found HAC based on the following analysis:

The Court will begin its analysis by focusing on the experience of Ms. Briles. Arriving home from a routine visit to the grocery store the five-foot-three-inch, 142 pound housewife was accosted and incapacitated in her own home by the five-foot-eleven-inch, 260-

pound intruder Delmer Smith. Upon examination, the medical examiner found three areas of binding: around her neck and throat with duct tape, hands duct taped together and bound behind her back, and her legs around the ankles also bound. The medical examiner opined this took place while she was alive. Contusions found on the victim's body were attributed to blunt trauma, most likely received by blows or kicks. The most significant nonlethal blow received by Ms. Briles was a fracture to the jaw bilaterally. The medical examiner concluded this was most likely caused by her head hitting the floor or some other blunt object striking the jaw directly. Displacement of furniture about the house evidenced at least some futile resistance put up by Ms. Briles.

Before addressing the manner by which death was inflicted, the Court notes that a significant abdominal injury was suffered by Ms. Briles. Ms. Briles' liver suffered a 5-6 centimeter laceration spanning the two lobes of the liver. The liver injury was inflicted while Ms. Briles was still alive as established by the presence of 500 milliliters of unclotted blood in the abdomen. Since no external injury corresponded to the internal injury, the medical examiner concluded that blunt trauma (a kick or knee to the abdomen) caused this injury, which would have been fatal without medical attention.

As for the mechanism by which death actually resulted, the [medical] examiner concluded that multiple blows to Ms. Briles' head with a 23-pound metal antique sewing machine created numerous skull fractures which compressed the bone into the brain causing massive hemorrhage and, ultimately, death.

From this outline of the sequalae leading to Ms. Briles' death, it takes little effort to imagine the fear, terror, anxiety, and hopelessness that the victim experienced in the minutes before she died. From the evidence, we also know that the antique sewing machine used as the instrument of death was obtained by the defendant from a closet in which it was stored. Transporting it from that location, the Defendant (having previously subjected Ms. Briles to excruciating pain and discomfort) brought the instrument down with great force on Ms. Briles' skull. From an objective standpoint, it is evident that this murder was shockingly evil and outrageously wicked, conscienceless, and pitiless.

Smith urges this Court to reject these findings, resting his argument primarily on two factors. First, he relies on the medical examiner's testimony that the victim was lying facedown on her stomach when she was beaten to death, concluding that this means the victim did not see Smith strike her with the sewing machine. Second, he contends that the first blow to the victim's head could have rendered the victim immediately unconscious.

Upon a review of the record, we conclude that competent, substantial evidence supports the trial court's findings. The testimony from trial, as recounted by the trial court in its sentencing order, supports the trial court's conclusion that the crime began when the victim was "accosted" outside of her home and then "incapacitated in her own home." She was bound with duct tape with "her hands . . . together and bound behind her back, and her legs around the ankles also bound." Duct tape also covered her mouth so that not only was she rendered completely helpless but she could not cry out. As she was not blindfolded, she was able to see the events transpire around her.

After conducting an autopsy, Dr. Broussard concluded that the victim sustained numerous injuries that were in addition to the fatal injuries caused by the significant blows to the back of the victim's head. Many of the victim's injuries could not have occurred while she was lying facedown. Specifically, the victim sustained a bruised elbow, even though her arms were bound behind her back.

Further, her lacerated liver was caused by a serious kick or blow to the abdomen—additional indication of the suffering the victim endured while bound and aware of her impending death. The injury to the victim's liver caused significant bleeding—500 milliliters of blood. This evidence established that the injury occurred long enough before her death to permit this significant amount of blood to accumulate and that the injury did not occur after the fatal blows to the head.

After causing a serious injury to the victim's abdomen while she was helpless and confined, Smith then used his weapon of choice—a sewing machine from another room—to brutally beat the victim to death. Accordingly, all of these facts provide competent, substantial evidence to support the trial court's finding of HAC.

However, even if this aggravator were struck, any error in finding HAC would be harmless beyond a reasonable doubt as it would not have affected the trial court's weighing process in light of the other four significant aggravators that apply to the murder. See, e.g., Cole v. State, 36 So. 3d 597, 610 (Fla. 2010) (holding that in light of the remaining aggravators, the erroneous consideration of HAC did not prejudicially affect the weighing process); Watts v. State, 593 So. 2d 198, 204 (Fla. 1992). We therefore deny relief as to this claim.

## VI. Rejection of Two Statutory Mitigators

In Smith's next penalty-phase claim, he asserts that the trial court erred in rejecting two statutory mitigators: (1) Smith committed the capital felony while he was under the influence of an extreme mental or emotional disturbance; and (2) Smith's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

When a trial court is considering whether a mitigating circumstance is established, this Court has described the applicable standard as follows:

> Whenever a reasonable quantum of competent, uncontroverted evidence of mitigation has been presented, the trial court must find that the mitigating circumstance has been proved. A trial court may reject a defendant's claim that a mitigating circumstance has been proved if the record contains substantial evidence to support the trial court's rejection of the mitigating circumstance.

Hoskins v. State, 965 So. 2d 1, 16 (Fla. 2007) (quoting Nelson v. State, 850 So. 2d 514, 529 (Fla. 2003)). However, with respect to expert psychological evaluations, "expert testimony alone does not require a finding of extreme mental or emotional disturbance." Heyne v. State, 88 So. 3d 113, 125 (Fla. 2012) (quoting Foster v. State, 679 So. 2d 747, 755 (Fla. 1996)). "Instead, the trial court may disregard expert opinion where it determines that the opinion is unsupported by the facts or conflicts with other evidence." Id. "A trial court has broad discretion in determining the applicability of a particular mitigating circumstance, and this Court will uphold the trial court's determination of the applicability of a mitigator

- 31 -

when supported by competent substantial evidence." Hoskins, 965 So. 2d at 17

(quoting Philmore v. State, 820 So. 2d 919, 936 (Fla. 2002)).

The trial court's sentencing order provided the following analysis regarding

its rejection of the statutory mitigation at issue:

1.  The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance.

During the penalty stage, the defense called Dr. Hyman Eisenstein, a licensed psychologist, to testify about defendant's mental health. Dr. Eisenstein performed neuropsychological testing and conducted a clinical interview. After his examination, Dr. Eisenstein concluded that Mr. Smith has "unequivocal brain damage" and "brain impairment," and as a result of these deficits Mr. Smith's decision-making ability is profoundly impaired. While Dr. Eisenstein also suggested Mr. Smith has an Antisocial Personality Disorder, he believes that "brain pathology" better explains Mr. Smith's behavior. Ultimately Dr. Eisenstein testified that Mr. Smith was under the influence of extreme mental and emotional disturbance and that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

To bolster the testimony of Dr. Eisenstein, the defense requested that an MRI and a PET scan be performed. To interpret the results of these tests the defense asked the court to appoint Dr. Ruben Gur to analyze the results. . . . At the Spencer hearing, Dr. Gur testified that the brain testing revealed the existence of frontal lobe damage which has major behavioral consequences for Mr. Smith, and Dr. Eisenstein repeated his previous conclusion that Mr. Smith lacks the ability to control himself in high pressure situations through his inability to control his "amygdala response." In fact, Dr. Eisenstein testified that Mr. Smith was subject to "amygdala meltdown" in highly stressful situations. Both doctors testified that Mr. Smith's brain damage inevitably led to disinhibited behavior; nevertheless, both doctors conceded that there was no current scientific consensus on the existence or degree of frontal lobe damage and the corresponding "disinhibited" behavior one might expect to see.

To rebut the testimony of Eisenstein and Gur, the State called Dr. Wade Myers to testify at the penalty phase before the jury and Dr.

Helen Mayberg at the <u>Spencer</u> hearing.  In brief, Dr. Myers opined that Mr. Smith had Antisocial Personality Disorder, and Dr. Mayberg opined that her review of the MRI and PET scan showed no brain damage whatsoever.

This brief recitation reflects that the opinion of the experts conflicted radically.  It is the burden of the defendant to establish the existence of mitigating factors; and it is within the discretion of the Court to reject a statutory mitigator where the defense expert's testimony is rebutted by another expert.  Since the Court finds the testimony of Dr. Myers and Dr. Mayberg more persuasive and convincing, the defendant failed to meet this burden.  Even if frontal lobe damage exists (which the court does not find to be the case) there is simply no competent evidence to suggest that on August 3, 2009, Delmer Smith was under the influence of an extreme mental or emotional disturbance.  All of his behavior on the day of the murder and the days after appears cold, calculated, rational, and goal-directed.  Based on this evidence, the Court is not reasonably convinced of the existence of this factor.

2. <u>The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired</u>.

For the reasons discussed in the preceding section the Court finds that the defendant did not meet his burden and this mitigator has not been proved.

Smith asserts that the trial court erred in failing to find these two statutory mitigators based on the claim that "Dr. Eisenstein's opinion was unequivocal and not refuted by another psychologist trained to interpret the neuropsychological testing."  Further, Smith criticizes the State's expert, Dr. Myers, because Dr. Myers did not perform his own testing for brain damage.

While Smith contends that a trial court cannot reject <u>unrebutted</u> mitigation, the cases upon which he relies are factually distinguishable because in those cases,

unlike here, the mitigation was, in fact, unrebutted.  See Coday v. State, 946 So. 2d 988, 1004-05 (Fla. 2006) (holding that the trial court erred in rejecting the statutory mitigator because the defendant presented six defense mental health experts who testified that the defendant was unable to conform his conduct to the requirements of the law at the time of the murder, particularly as the State did not offer any expert witnesses to refute such testimony and there was no other rational basis to reject the testimony); Nibert v. State, 574 So. 2d 1059, 1062 (Fla. 1990) (holding that the trial court erred in rejecting the statutory mitigators that the defendant committed the murder while under the influence of an extreme mental or emotional disturbance and that his capacity to control his behavior was substantially impaired because (1) the defendant presented an expert who supported those conclusions with a battery of tests and interviews with family members; (2) the record also supported those conclusions; and (3) this evidence was not refuted by the State).

In this case, Smith is merely attacking the appropriate weight of the experts' testimony, and as the trial court recognized, the experts' opinions varied wildly.  In considering all of the evidence presented, the trial court found that the testimony of Dr. Myers and Dr. Mayberg was "more persuasive and convincing."  In addition, the trial court further noted that the evidence did not support that Smith committed the murder while under the influence of an extreme mental or emotional disturbance because "[a]ll of his behavior on the day of the murder and the days

after appears cold, calculated, rational, and goal-directed." As this Court has held, "[f]inding or not finding a specific mitigating circumstance applicable is within the trial court's domain, and reversal is not warranted simply because an appellant draws a different conclusion." Cook v. State, 542 So. 2d 964, 971 (Fla. 1989) (quoting Stano v. State, 460 So. 2d 890, 894 (Fla. 1984)).

Because the record provides competent, substantial evidence to support the trial court's findings and the trial court rejected these mitigators based on credibility determinations, we reject this claim.

## VII. Constitutionality of Florida's Death Penalty Scheme

In his last claim, Smith contends that his death sentence is unconstitutional in light of Ring. However, because the trial court found the prior-violent-felony aggravator and because the jury unanimously recommended the sentence of death, Ring is not implicated. See Gonzalez, 136 So. 3d at 1168; Crain v. State, 894 So. 2d 59, 78 (Fla. 2004). This claim is therefore without merit and does not implicate the issues raised in Hurst v. State, 147 So. 3d 435 (Fla. 2014), which the United States Supreme Court granted certiorari to review. Hurst v. Florida, 135 S. Ct. 1531 (2015).

## VIII. Proportionality of Sentence of Death

Although Smith does not raise proportionality on appeal, this Court has an independent obligation to review the proportionality of a sentence of death,

regardless of whether it is raised by a party.  See England v. State, 940 So. 2d 389, 407 (Fla. 2006); see also Fla. R. App. P. 9.142(a)(5).  Because the death penalty is reserved for only those cases where the most aggravating and least mitigating circumstances exist, this Court must undertake a proportionality review "in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence."  Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003) (citation omitted).  In performing this review, this Court considers the totality of the circumstances and compares the case with other similar capital cases. Duest v. State, 855 So. 2d 33, 47 (Fla. 2003).  This Court does not simply compare the number of aggravating and mitigating circumstances, but rather performs a qualitative review of the underlying basis for each aggravator and mitigator.  See McCoy v. State, 132 So. 3d 756, 771 (Fla. 2013), cert. denied, 135 S. Ct. 90 (2014); Urbin v. State, 714 So. 2d 411, 416 (Fla. 1998).

In this case, the jury unanimously recommended that Smith be sentenced to death.  The trial court found five aggravators and assigned each the following weight: (1) Smith was on felony probation (moderate weight); (2) Smith had prior violent felony convictions (great weight as to the 1991 state robbery conviction and the 1995 federal armed bank robbery convictions); (3) the murder was committed in the course of a burglary (moderate weight); (4) the murder was

committed for pecuniary gain (merged with the committed-in-the-course-of-a-burglary aggravator); and (5) the murder was HAC (great weight). Against these aggravators, the trial court rejected Smith's proposed statutory mitigation and found and weighed five nonstatutory mitigating factors: (1) intermittent explosive disorder (moderate weight); (2) a loving relationship with nieces (little weight); (3) physical, emotional, and sexual abuse as a child (little weight); (4) acute academic failure and attention deficit disorder (significant weight); and (5) good conduct while in custody (moderate weight).

Given the extremely significant aggravation, including Smith's history of violent crime and the fact that he was on felony probation at the time of the murder, together with the facts and circumstances of this crime, we conclude that death is a proportionate sentence. This is neither the least aggravated nor most mitigated of death cases. A review of other cases establishes that death is a proportionate punishment in this case. For example, in King v. State, 130 So. 3d 676, 686-87 (Fla. 2013), cert. denied, 134 S. Ct. 1323 (2014), we held the sentence of death to be proportionate based on a murder in which the defendant bludgeoned the victim to death during a burglary. The trial court found two aggravators—committed during a burglary (merged with pecuniary gain) and HAC—and weighed those against sixteen nonstatutory mitigators, including the lack of a

violent history, and determined that death was a proportionate punishment. Id.
Here, instead of a nonviolent criminal history, Smith had a violent criminal history.

We have also considered Banks v. State, 46 So. 3d 989, 1000-01 (Fla. 2010), where we concluded that the death sentence was proportionate after the defendant stabbed the victim to death and then took her car. In that case, the trial court found three aggravators—prior violent felony convictions; HAC; and cold, calculated, and premeditated—which were weighed against low IQ, brain deficits, antisocial personality traits, and difficult youth. Id.; see also Gosciminski, 132 So. 3d at 716-17 (holding that the death sentence was proportionate where the defendant fatally stabbed and bludgeoned the victim during a burglary; the trial court found three aggravators—CCP, HAC, and committed during a robbery or burglary—and then weighed those aggravators against the statutory mitigator of no significant history of criminal activity and thirteen nonstatutory mitigators, which were given little to moderate weight); Miller v. State, 42 So. 3d 204, 229-30 (Fla. 2010) (holding that the death sentence was proportionate where the defendant fatally stabbed a seventy-two-year-old victim; the trial court found five aggravators—prior violent felony conviction, HAC, committed while on parole, committed during a burglary, and victim was particularly vulnerable—which were weighed against six nonstatutory mitigating circumstances).

Examining the facts of this case, including the aggravators and mitigators found, and comparing it to other similar cases where this Court has upheld the death sentence as a proportionate penalty, we conclude that Smith's death sentence is proportionate.

**CONCLUSION**

After a thorough review of all the issues raised by Smith, and after our own independent review of the proportionality of Smith's sentence of death, we affirm Smith's conviction for first-degree murder and sentence of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Manatee County,
     Peter A. Dubensky, Judge - Case No. 412010CF000479CFAXMA

Howard L. Dimmig, II, Public Defender, and Julius Joseph Aulisio, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

     for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Carol Marie Dittmar, Senior Assistant Attorney General, Tampa, Florida,

     for Appellee